IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

DEC 2 7 2012

Richmond Division

CASSANDRA FLOWERS,           )
     Plaintiff,           )
                         )
     v.                  )           CIVIL NO. 3:12cv486-REP
                         )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security,  )
     Defendant.           )
_____)

## REPORT AND RECOMMENDATION

Cassandra Flowers ("Plaintiff") is 48 years old and previously worked as a newspaper

and mail inserter. On May 19 and May 22, 2010, Plaintiff protectively applied for Social

Security Disability ("DIB") and Supplemental Security Income ("SSI") under the Social Security

Act (the "Act"), claiming disability due to back pain, degenerative disc disease, lumbar spine

impairments, multiple joint arthritis, orthopedic disorders, carpal tunnel syndrome, depression

and pancreatitis with an alleged onset date of September 15, 2009. Plaintiff's claim was

presented to an ALJ, who denied Plaintiff's requests for benefits. The Appeals Council

subsequently denied Plaintiff's request for review on October 31, 2011.

Plaintiff now challenges the ALJ's assignment of weight to her treating doctors'

opinions. (Pl.'s Mem. of Points and Author. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 13-

21.) She further complains that the ALJ's assessment of credibility was unsupported by

substantial evidence. (Pl.'s Mem. at 21-24.) Finally, Plaintiff alleges that the Appeals Council

failed to adequately consider new evidence. (Pl.'s Mem. at 24-26.)

Plaintiff seeks judicial review of the ALJ's decision in this Court pursuant to 42 U.S.C.

§ 405(g). The parties have submitted cross-motions for summary judgment, which are now ripe

for review.[1]  Having reviewed the parties' submissions and the entire record in this case, the

Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1)(B).  For the reasons that follow, it is the Court's recommendation that Plaintiff's

motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that

Defendant's motion for summary judgment (ECF No. 11) be GRANTED; and that the final

decision of the Commissioner be AFFIRMED.

## I. BACKGROUND

Plaintiff challenges the ALJ's assessment of her credibility, assignment of weight to the

physicians' opinions and evaluation of new evidence at the Appeals Council.  Therefore,

Plaintiff's education and work history, physical and mental medical histories, medical opinions,

reported activities of daily living, the hearing testimony and new evidence submitted to the

Appeals Council are summarized below.

**A.      Plaintiff's Education and Work History**

Plaintiff did not complete her GED.  (*See* R. at 50.)  She had taken computer courses at

Rudyard's College.  (R. at 50-51.)  Plaintiff was an inserter when she worked at H&H Mailing

Company.  (R. at 52.)  She testified that she supervised about five people.  (R. at 52.)

**B.      Plaintiff's Physical Medical Records**

On December 8, 2009, Plaintiff visited Durgada Basavaraj, M.D., a neurologist,

complaining of back pain rated at a five out of 10 while on medication and a seven out of 10

---

[1] The administrative record in this case has been filed under seal, pursuant to E.D. Va.
Loc. R. 5 and 7(C).  In accordance with these Rules, the Court will endeavor to exclude any
personal identifiers such as Plaintiff's social security number, the names of any minor children,
dates of birth (except for year of birth), and any financial account numbers from its consideration
of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information
to only the extent necessary to properly analyze the case.

while working or performing physical activity. (R. at 544.) Dr. Basavaraj observed a normal range of motion in her hip, knee and ankle without pain, along with 5/5 muscle strength with normal reflexes. (R. at 544.) He noted that Plaintiff had "not pursued water aerobics," despite his encouragement. (R. at 554.)

On January 19, 2010, Plaintiff visited Harold T. Green Jr., M.D., complaining of lower back and leg pain and no relief with a Lidocaine patch. (R. at 370.) Dr. Green observed no sensory or motor findings and no edema, clubbing, cyanosis or ulceration. (R. at 370.) Plaintiff was diagnosed with chronic pain syndrome, pancreatitis, degenerative disc disease and spinal stenosis at the L3-L4 and L4-L5. (R. at 370.) She was prescribed Percocet and encouraged to take her medications as instructed. (R. at 370.)

A few months later, Plaintiff complained of constant back pain. (R. at 543.) Dr. Basavaraj again noted a normal range of motion, 5/5 muscle strength and normal reflexes. (R. at 543.) He determined that Plaintiff's MRI of her lumbar spine indicated that her L4-L5 disc was "more to right" and her pain was "mostly musculoskeletal." (R. at 543.) Dr. Basavaraj prescribed Percocet "for a few months to help with rehab" and again encouraged water aerobics. (R. at 543.)

On March 3, 2010, Plaintiff reported an aching, worsening pain in her lower back and legs to Dr. Green. (R. at 369.) Dr. Green noted that Plaintiff stated that Percocet was "the only medication[] that will work and [she] did not seem open to trying any other medications even when educated about other options." (R. at 369.) She admitted to taking three Percocet pills at a time and using heroin within the last year. (R. at 369.) Dr. Green observed no sensory or motor findings and no edema, clubbing, cyanosis or ulceration, but noted tenderness over her spine and a limited range of motion. (R. at 369.)

In April 2010, Dr. Basavaraj indicated that Plaintiff was not improving, but documented Plaintiff's normal range of motion, 5/5 muscle strength and normal reflexes. (R. at 542.) That same month, Dr. Green observed no sensory or motor findings and no edema, clubbing, cyanosis or ulceration. (R. at 367.) He encouraged Plaintiff to exercise three to five times a week for 20 to 60 minutes, take medications as instructed, lose weight, stop smoking and avoid excessive alcohol intake. (R. at 367.)

On May 1, 2010, Plaintiff underwent a MRI of her lumbar spine without contrast, which revealed mild degenerative disc disease at L3-L4, moderate degenerative disc disease at L4-L5 and disc material abutting the right L4 nerve root. (R. at 315.) A few weeks later, Plaintiff visited Dr. Basavaraj, who again documented a normal range of motion, 5/5 muscle strength, normal reflexes, minimal deficits and right shoulder pain. (R. at 540.)

On June 3, 2010, Plaintiff visited Dr. Green, stating that she had lower back pain with radiation down her leg, that Percocet gave her some relief and that she lost her medication and reported it to the police. (R. at 366.) Dr. Green observed no sensory or motor findings and no edema, clubbing, cyanosis or ulceration, but also noted tenderness in the L4-L5 and S1 with spasms and a decreased range of motion. (R. at 366.) One month later, Plaintiff indicated that her lower back pain had improved, but that she had not begun therapy. (R. at 480.) Dr. Green observed no sensory or motor findings and no edema, clubbing, cyanosis or ulceration and recommended Plaintiff to exercise three to five times a week for 20 to 60 minutes and to take medication as instructed. (R. at 480.)

In July and August 2010, Dr. Basavaraj observed Plaintiff's normal range of motion, 5/5 muscle strength and normal reflexes, and continued to prescribe Percocet. (R. at 455-58.) After a nerve study of Plaintiff's right and left arms on August 28, 2010, Dr. Basavaraj noted normal

extremities. (R. at 470-71.) In September 2010, Dr. Basavaraj injected Plaintiff's trigger points and noted Plaintiff's normal range of motion, 5/5 muscle strength and normal reflexes. (R. at 453-54.)

Plaintiff also visited Dr. Green twice in September 2010, complaining of sharp, deep pains in her lower back for three days and no relief with medication. (R. at 479.) He observed no sensory or motor findings, a tender abdomen and no edema, clubbing, cyanosis or ulceration. (R. at 478-79.) Plaintiff was again encouraged to take her medications as instructed. (R. at 478.)

In October and November 2010, Dr. Basavaraj injected her trigger points again. (R. at 450-52.) Plaintiff told him that she was attending water aerobics one to two times a week in November 2010, which he encouraged her "to pursue as a long-term rehabilitation to improvement in function, reduce tolerance to narcotics and potentially improve re-activations of endorphins, pain and function." (R. at 450-51.) On November 9, 2010, Dr. Green again noted no sensory or motor findings and no edema, clubbing, cyanosis or ulceration. (R. at 477.) A few days later, Plaintiff admitted to alcohol use and less abdominal pain to Dr. Green. (R. at 476.) Dr. Green documented no sensory or motor findings and no edema, clubbing, cyanosis or ulceration. (R. at 476.) A few weeks later, Plaintiff "felt good," had no sensory or motor findings, had no edema, clubbing, cyanosis or ulceration and was encouraged to exercise for 20 to 60 minutes three to five times each week. (R. at 474.)

## C. Plaintiff's Mental Medical Records

On October 22, 2009, Plaintiff was admitted to the hospital overnight after ingesting 10 Tramadol tablets for her chronic pain. (R. at 317.) She had a history of alcohol dependence, heroin dependence and cocaine abuse. (R. at 317.) Plaintiff indicated that she did not attempt suicide, but had been depressed for six months and her fiancé had recently been incarcerated.

(R. at 318.) Her depression had recently worsened, because she was fired from her cashier's job. (R. at 318.) A few days before she was admitted to the hospital, Plaintiff used alcohol, cocaine and heroin. (R. at 318.)

On December 2, 2009, Plaintiff visited Sultan Lakhani, M.D., for an initial psychiatric evaluation. (R. at 302-03.) Dr. Lakhani characterized Plaintiff's October hospital stay as a suicide attempt. (R. at 302.) He documented that Plaintiff had used alcohol, heroin and marijuana recently. (R. at 302.) Plaintiff indicated that she had not worked in two years. (R. at 302.) Dr. Lakhani observed a sickly-looking Plaintiff with sad expression, an anxious and depressed mood and affect, poor judgment and insight, and an avoidance of eye contact. (R. at 302.) Plaintiff was diagnosed with drug-induced mood disorder and a combination of drug dependency (including alcohol, heroin, cocaine and marijuana). (R. at 302.)

Later that month, plaintiff followed-up with Nancy Wallace, FNP, who documented that Plaintiff was not sleeping well at night, had an internal voice that told her to "do bad things" and had not taken heroin, alcohol, cocaine or marijuana since the beginning of the month. (R. at 304.) Plaintiff was tolerating her medication, but did not feel any better and had a depressed mood and irritable affect. (R. at 304.) In March 2010, Plaintiff was "seen in follow-up two months later than expected" and had been out of medication for two months. (R. at 306.) She reported feeling depressed, having poor sleep and drinking beer within the week. (R. at 306.) Plaintiff questioned whether her medications helped her illness. (R. at 306.)

On April 19, 2010, Plaintiff reported to Ms. Wallace that she was doing okay overall, was taking her medication and tolerating them well, was sleeping poorly and was easily irritable and impatient. (R. at 307.) Ms. Wallace documented that Plaintiff had a depressed mood, irritable affect and no psychosis. (R. at 307.) In July 2010, Plaintiff visited Dr. Lakhani, complaining

that she was not sleeping well and that the medications prescribed to her were not helping. (R. at 445.) Plaintiff reported that she had been clean and sober for six months. (R. at 445.) Dr. Lakhani documented an anxious affect and depressed mood and diagnosed Plaintiff with drug-induced mood disorder and a combined drug dependency in remission. (R. at 445.)

On August 11, 2010, Ms. Wallace noted that Plaintiff had a euthymic mood, irritable affect and no psychosis. (R. at 443.) Plaintiff stated that Ms. Wallace was not "treating her right." (R. at 443.) Plaintiff was sleeping poorly, took her friend's Xanax to sleep, watched television, performed household chores, admitted to drinking beer over the weekend and indicated that she had an "okay" energy level during the day. (R. at 443.) In September 2010, Plaintiff was "a month late for her appointment" and out of medication, sleeping poorly and struggling with chronic pain. (R. at 442.) Ms. Wallace observed a euthymic mood with no psychosis. (R. at 442.) One month later, Ms. Wallace again observed a euthymic mood with no psychosis. (R. at 440.) Plaintiff complained that she was not feeling very well, had a panic attack recently, felt agitated, was sleeping poorly and could no longer live in her chaotic household. (R. at 440.)

In January 2011, Plaintiff visited Ms. Wallace and indicated that she had run out of her medication for two weeks, felt more irritable and depressed without her medication and could not sleep well. (R. at 573.) Ms. Wallace observed that Plaintiff had an irritable mood with an appropriate affect and no psychosis. (R. at 573.) Two months later, Ms. Wallace documented that Plaintiff had missed her last two appointments, was out of medicine, had poor sleep and had a depressed mood, tearful affect, no psychosis as well as feelings of hopelessness. (R. at 571.)

On June 17, 2011, Plaintiff was frustrated, because she needed money to pay a debt to obtain supportive housing. (R. at 569.) Plaintiff continued to have chronic pain, was

experiencing bad dreams and stopped drinking alcohol for a few months. (R. at 569.) Ms. Wallace documented Plaintiff's depressed mood, appropriate affect, no psychosis, feelings of hopelessness and tiredness, and passive suicide ideations. (R. at 569.)

## D.    The Opinions of Plaintiff's Treating Doctors

On January 11, 2010, Dr. Green completed a Medical Report for General Relief and Medicaid, diagnosing Plaintiff with disc degeneration disease and chronic muscle spasms, both with poor prognosis. (R. at 404.) Dr. Green wrote that Plaintiff could not work and was currently under a pain management program with medication. (R. at 404.)

On June 1, 2010, Dr. Basavaraj completed a Multiple Impairment Questionnaire in which he diagnosed Plaintiff with a lumbar condition that was stable with exercise and pain medication. (R. at 576-83.) Plaintiff had constant back pain rated at a four or a five out of 10. (R. at 578.) He opined that Plaintiff could only sit for four hours during an eight-hour workday, stand or walk for two hours during an eight-hour workday and would need to move around once every 30 minutes. (R. at 578.) Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds and had no limitations with grasping objects, using her fingers or using her arms. (R. at 579-80.)

Plaintiff was prescribed Percocet and Lyrica and performed water aerobics. (R. at 580.) Her symptoms would likely increase if she were in a competitive work environment. (R. at 580.) Plaintiff's pain and fatigue periodically interfered with her attention and concentration, rendering her capable of moderate stress. (R. at 581.) Dr. Basavaraj opined that Plaintiff would likely be absent from work for more than three times a month and could not push, pull, kneel, bend or stoop. (R. at 582.)

On November 10, 2010, Ms. Wallace completed a Psychiatric/Psychological Impairment Questionnaire, diagnosing Plaintiff with mild depressive disorder with anxiety and a history of

substance abuse. (R. at 558-65.) Ms. Wallace assessed Plaintiff's GAF at 60 with a fair

prognosis. (R. at 558.) Ms. Wallace marked that Plaintiff had sleep disturbance, personality

change, mood disturbance, emotional lability, a history of substance abuse, recurrent panic

attacks, a suicide attempt in 2009, social withdrawal or isolation, hostility and irritability. (R. at

559.)

Ms. Wallace opined that Plaintiff was moderately limited with her ability to maintain

attention and concentration for extended periods; perform activities within a schedule; sustain

ordinary routine without supervision; work in coordination with others without being distracted;

make simple work related decisions; complete a normal workweek without interruption; interact

appropriately with the general public; ask simple questions or request assistance; accept

instructions and respond appropriately to criticism from supervisors; maintain socially

appropriate behavior; and respond appropriately to changes in the work setting. (R. at 561-62.)

Plaintiff was markedly limited with her ability to get along with co-workers or peers without

distracting them or exhibiting behavioral extremes. (R. at 562.) Ms. Wallace noted that Plaintiff

was easily overwhelmed and agitated and would withdraw from situations or behave

unpredictably. (R. at 563.) Plaintiff's depression increased her chronic pain. (R. at 564.) She

was capable of low stress and would be absent from work two to three times a month. (R. at

563-64.) Plaintiff's limitations began in at least 2009. (R. at 565.)

On December 3, 2010, Dr. Green completed a Multiple Impairment Questionnaire,

indicating that Plaintiff's diagnoses included hepatitis, hyperlipidemia, pancreatitis,

cholelithiasis, chronic obstructive pulmonary disease ("COPD"), radiculitis, chronic pain

syndrome, muscle spasms, degenerative disc disease and spinal stenosis, all with a poor

prognosis. (R. at 523-30.) Dr. Green noted that Plaintiff had lower back and sides that were

tender to light palpitation and daily pain. (R. at 523, 525.) Plaintiff's lower back, neck and side pain was severe with mobility and physical functions. (R. at 524.) Pushing, pulling, reaching, stooping and bending created Plaintiff's pain, as did constant walking or sitting for prolonged periods of time. (R. at 525.)

Dr. Green rated Plaintiff's pain and fatigue at 10 out of 10 that could not be relieved completely with medication. (R. at 525.) Plaintiff could sit, walk or stand for up to one hour during an eight-hour day, could not continuously sit and could never lift or carry five pounds. (R. at 525-26.) Dr. Green noted that Plaintiff had marked limitation grasping objects or using her arms for reaching and a moderate limitation in using her fingers for fine manipulations. (R. at 526-27.) He opined that Plaintiff's symptoms would increase if she were in a competitive work environment, Plaintiff could not keep her neck in a constant position and that Plaintiff could not perform a full-time competitive job on a sustained basis. (R. at 527-28.)

Plaintiff's pain and fatigue constantly interfered with her attention and concentration, while stressful situations as well as her living conditions contributed to her pain. (R. at 528.) Dr. Green marked that Plaintiff was incapable of even low stress and wrote that Plaintiff could not do any type of work. (R. at 528.) Dr. Green indicated that all days were bad for Plaintiff. (R. at 529.) Finally, Plaintiff was limited psychologically, could not push, pull, kneel, bend or stoop, and needed to avoid fumes, gases and dust. (R. at 529.) Dr. Green wrote that these limitations had been present since November 14, 2007. (R. at 529.)

On July 6, 2011, Dr. Green completed a Medical Report for General Relief and Medicaid, noting that Plaintiff's chief complaint was COPD with a poor prognosis for her degenerative disc disease, radiculitis and spinal stenosis. (R. at 567.) Dr. Green opined that Plaintiff was

permanently unable to work, Plaintiff was following his recommended medical plan and that Plaintiff was under pain management with medication. (R. at 567.)

On August 30, 2011, Dr. Lakhani and Ms. Wallace wrote a narrative report documenting Plaintiff's depression, mood swings, crying spells, poor sleep and substance abuse. (R. at 592.) Plaintiff was being treated primarily by Ms. Wallace for major depression with anxiety and substance abuse. (R. at 592.) Plaintiff admitted to episodic alcohol abuse and denied any recent use of heroin or marijuana. (R. at 592.) Ms. Wallace indicated that Plaintiff had difficulty maintaining relationships and reported depression, anxiety, poor sleep, irritability and isolation. (R. at 592.) Plaintiff's "depressive symptoms amplif[ied] her perception of pain." (R. at 592.) Plaintiff had not been gainfully employed since at least 2007 and her mental and physical illnesses rendered her unable to work in the future. (R. at 592.)

### E. The Opinions of Non-Treating State Agency Doctors

On August 2, 2010, David L. Niemeier, Ph.D., a non-treating state agency psychologist, noted that there was insufficient evidence to substantiate the presence of an affective or substance abuse disorder. (R. at 85.) A few days later, J. Astruc, M.D., a non-treating state agency physician, opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand or walk for about six hours during an eight-hour workday and sit for about six hours during an eight-hour workday. (R. at 86-87.) She could occasionally climb stairs, stoop, kneel, crouch or crawl, but never climb ladders. (R. at 87.)

In December 2010, Alan D. Entin, Ph.D., ABPP, a non-treating state agency psychologist, opined that Plaintiff had a mild restriction in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation. (R. at 106.) David C.

11

Williams, M.D., a non-treating state agency physician, reaffirmed Dr. Astruc's opinions about Plaintiff's limitations. (R. at 108-09.)

### F. Plaintiff's Activities of Daily Living

On June 27, 2010, Samala Indoosi, Plaintiff's friend for five years, wrote that Plaintiff could watch television, wash the dishes, prepare her own food, shop and attend her appointments. (R. at 238, 240.) She could no longer walk, sit or stand for long periods of time. (R. at 239.) She could not sleep, because her back hurt. (R. at 239.) Plaintiff regularly went outside, used public transportation and could travel alone. (R. at 241.)

Ms. Indoosi marked that Plaintiff's conditions affected her ability to lift, stand, walk, sit, climb, kneel, squat, reach, bend and use her hands. (R. at 243.) Plaintiff could only lift five pounds, walk for five blocks or stand over 30 minutes. (R. at 244.) She could follow written and spoken instructions, handle changes in routine and get along with authority figures well. (R. at 224-45.) Plaintiff did not handle stress well and occasionally used a cane. (R. at 245.)

In March 2011, Plaintiff completed a Daily Activities Questionnaire in which she wrote that she lived with her sister, washed dishes, laundered clothes, attended church, shopped for groceries, cooked and took walks about four times a week. (R. at 278-82.) She also watched television, played cards and read magazines and the Bible. (R. at 279.) Plaintiff did not have a valid driver's license, could use public transportation without assistance, visited with family members every day and slept for four to five hours a night. (R. at 280-81.) She indicated that she had leg and back pain and a co-worker "got on her nerves." (R. at 282.)

### G. Plaintiff's Testimony

On September 2, 2011, Plaintiff testified before the ALJ, stating that she lived in an upstairs room and received food stamps and tenant relief. (R. at 42-69.) Her driver's license was

taken away when she failed to pay a fine. (R. at 51.) Plaintiff indicated that she was not "really sure" whether she had worked since September 2009. (R. at 52.)

Plaintiff experienced chronic daily pain in her back and right leg. (R. at 53.) She underwent injections in her back, but they did not help her pain. (R. at 54.) When she had the money to take her prescription pain medication, the medication would reduce her pain to about a five out of 10 on the pain scale. (R. at 55.) She could only lift about five pounds, stand for about 10 minutes, sit for about 10 minutes and walk for about five minutes. (R. at 56-57.) Plaintiff testified that she had a cane prescribed to her, but she did not use it every day and did not use it for the hearing. (R. at 57.)

Plaintiff slept for about three hours a night and did not nap during the day. (R. at 58.) She indicated that her sister helped her shop for groceries, but she made her own food, cleaned, played cards and went to church. (R. at 58-59.) Plaintiff did not need any help to care for herself. (R. at 59.) She indicated that she was told that her medication would cause her to be dizzy. (R. at 60.) Plaintiff participated in water aerobics, but it made her sore. (R. at 60.)

Plaintiff took medication for her psychiatric problems. (R. at 61-62.) She had visited a counselor. (R. at 62-63.) Plaintiff smoked cigarettes, testified that she last drank over a year before the hearing and had not used any drugs since September 2009. (R. at 63-64.)

## H.    The Opinion of Prakash Ettigi, M.D.

Plaintiff first visited Prakash Ettigi, M.D., on February 21, 2010, who diagnosed Plaintiff with mild depressive disorder with anxiety. (R. at 291.) On March 6, 2012, Dr. Ettigi assessed Plaintiff's current GAF at a 55. (R. at 291, 298.) Plaintiff was guarded, unable to work and plagued with chronic disability. (R. at 291.) Dr. Ettigi marked that Plaintiff had weight loss of 50 pounds, sleep disturbance, irritability, depression, an anxious mood, social withdrawal,

13

decreased energy, recurrent panic attacks, pervasive loss of interests, psychomotor agitation, feelings of guilt, difficulty thinking or concentrating and a suicide attempt in 2009. (R. at 292.)

Dr. Ettigi opined that Plaintiff was moderately limited with her ability to understand and remember detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; sustain ordinary routine without supervision; make simple work-related decisions; complete a normal workweek without interruption; interact appropriately with the general public; accept instructions; get along with co-workers; and maintain socially appropriate behavior. (R. at 294-95.) He noted that Plaintiff was markedly limited in the ability to work in coordination with others without being distracted by them and respond appropriately to changes in the work setting. (R. at 294-95.) Plaintiff had experienced an episode of deterioration or decompensation and was unable to tolerate social interactions involving work, stress or a timeline. (R. at 296.) Her depression made her "less tolerant of pain in general." (R. at 297.) She was incapable of even low stress. (R. at 297.) She would likely be absent from work less than once a month; her ability to work was "considerably compromised by her chronic pain, depressed mood and recurrent anxiety." (R. at 298.)

## II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI on May 19 and May 22, 2010, claiming disability due to back pain, degenerative disc disease, lumbar spine impairments, multiple joint arthritis, orthopedic disorders, carpal tunnel syndrome, depression and pancreatitis with an alleged onset date of September 15, 2009. (R. at 81, 225-226.) The Social Security Administration ("SSA") denied Plaintiff's claims initially and on reconsideration.[2] (R. at 100, 127.) On September 2,

---

[2] Initial and reconsideration reviews in Virginia are performed by an agency of the state government — the Disability Determination Services ("DDS"), a division of the Virginia Department of Rehabilitative Services — under arrangement with the SSA. 20 C.F.R. pt. 404,

2011, Plaintiff testified at a hearing before an ALJ. (R. at 42-69.) On October 7, 2011, the ALJ issued a decision finding that Plaintiff was not under a disability, as defined by the Act. (R. at 25-32.) The Appeals Council subsequently denied Plaintiff's request to review the ALJ's decision on May 2, 2012, making the ALJ's decision the final decision of the Commissioner and subject to judicial review by this Court. (*See* R. at 1-4.)

## III. QUESTIONS PRESENTED

Was the Commissioner's evaluation of the opinions of Plaintiff's treating doctors supported by substantial evidence on the record and the application of the correct legal standard?

Was the Commissioner's evaluation of Plaintiff's credibility supported by substantial evidence on the record and the application of the correct legal standard?

Did the Appeals Council err by declining to review the ALJ's decision after new evidence was presented to the Council?

## IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether the Commissioner's decision was supported by substantial evidence on the record and whether the proper legal standards were applied in evaluating the evidence. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. Jan. 5, 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005)). Substantial evidence is more than a scintilla, less than a preponderance, and is the kind of relevant evidence a reasonable mind could accept as adequate to support a conclusion. *Id.* (citations omitted); *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

---

subpt. Q; *see also* § 404.1503. Hearings before administrative law judges and subsequent proceedings are conducted by personnel of the federal SSA.

To determine whether substantial evidence exists, the Court is required to examine the record as a whole, but it may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (citation and quotation marks omitted); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 589). In considering the decision of the Commissioner based on the record as a whole, the Court must "take into account whatever in the record fairly detracts from its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951) (internal quotation marks omitted)). The Commissioner's findings as to any fact, if the findings are supported by substantial evidence, are conclusive and must be affirmed. *Hancock*, 667 F.3d at 476 (citation omitted). While the standard is high, if the ALJ's determination is not supported by substantial evidence on the record, or if the ALJ has made an error of law, the district court must reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine if a claimant is eligible for benefits. 20 C.F.R. §§ 416.920, 404.1520; *Mastro*, 270 F.3d at 177. The analysis is conducted for the Commissioner by the ALJ, and it is that process that a court must examine on appeal to determine whether the correct legal standards were applied and whether the resulting decision of the Commissioner is supported by substantial evidence on the record. *See Mastro*, 270 F.3d at 176-77.

The first step in the sequence is to determine whether the claimant was working at the time of the application and, if so, whether the work constituted "substantial gainful activity"

("SGA").[3] 20 C.F.R. §§ 416.920(b), 404.1520(b). If a claimant's work constitutes SGA, the analysis ends and the claimant must be found "not disabled," regardless of any medical condition. *Id.* If the claimant establishes that she did not engage in SGA, the second step of the analysis requires her to prove that she has "a severe impairment . . . or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. § 416.920(c); *see also* 20 C.F.R. § 404.1520(c). To qualify as a severe impairment that entitles one to benefits under the Act, it must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c).

At the third step, if the claimant has an impairment that meets or equals an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (listing of impairments) and lasts, or is expected to last, for twelve months or result in death, it constitutes a qualifying impairment and the analysis ends. 20 C.F.R. §§ 416.920(d), 404.1520(d). If the impairment does not meet or equal a listed impairment, then the evaluation proceeds to the fourth step in which the ALJ is required to determine whether the claimant can return to her past relevant work[4] based on an assessment of the claimant's residual functional capacity ("RFC")[5] and the "physical and mental demands of

---

[3] SGA is work that is both substantial and gainful as defined by the Agency in the C.F.R. Substantial work activity is "work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before." 20 C.F.R. § 404.1572(a). Gainful work activity is work activity done for "pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b). Taking care of oneself, performing household tasks or hobbies, therapy or school attendance, and the like are not generally considered substantial gainful activities. 20 C.F.R. § 404.1572(c).

[4] Past relevant work is defined as SGA in the past fifteen years that lasted long enough for an individual to learn the basic job functions involved. 20 C.F.R. §§ 416.965(a), 404.1565(a).

[5] RFC is defined as "an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule."

work [the claimant] has done in the past." 20 C.F.R. §§ 416.920(e), 404.1520(e). If such work can be performed, then benefits will not be awarded. *Id.* The burden of proof remains with the claimant through step four of the analysis, such that she must prove that her limitations preclude her from performing her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Hancock*, 667 F.3d at 472 (citation omitted).

However, if the claimant cannot perform her past work, the burden then shifts to the Commissioner at the fifth step to show that, considering the claimant's age, education, work experience and RFC, the claimant is capable of performing other work that is available in significant numbers in the national economy. 20 C.F.R. §§ 416.920(f), 404.1520(f); *Powers v. Apfel*, 207 F.3d 431, 436 (7th Cir. 2000) (citing *Yuckert*, 482 U.S. at 146 n.5). The Commissioner can carry his burden in the final step with the testimony of a vocational expert ("VE"). When a VE is called to testify, the ALJ's function is to pose hypothetical questions that accurately represent the claimant's RFC based on all evidence on record and a fair description of all of the claimant's impairments, so that the VE can offer testimony about any jobs existing in the national economy that the claimant can perform. *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). Only when the hypothetical posed represents all of the claimant's substantiated impairments will the testimony of the VE be "relevant or helpful." *Id.* If the ALJ finds that the claimant is not capable of SGA, then the claimant is found to be disabled and is accordingly entitled to benefits. 20 C.F.R. §§ 416.920(f)(1), 404.1520(f)(1).

---

SSR-96-8p. When assessing the RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (*i.e.*, 8 hours a day, 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. *Id.* (footnote omitted).

# V. ANALYSIS

On October 7, 2011, the ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since September 15, 2009, her alleged onset date. (R. at 25-35.) At step two, the ALJ determined that Plaintiff was severely impaired from degenerative disc disease, depressive disorder and alcohol abuse. (R. at 28.) At step three, the ALJ concluded that Plaintiff's maladies did not meet one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (R. at 28.)

The ALJ then determined that Plaintiff had the RFC to perform light work, except that she could only occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 29.) Plaintiff could perform unskilled, competitive, remunerative work on a sustained basis and was capable of understanding, remembering and carrying out simple instructions; making judgments while performing unskilled work; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. (R. at 29-30.) The ALJ summarized Plaintiff's written statements, which alleged that she was disabled due to back pain, degenerative disc disease, lumbar spine impairment, multiple joint arthritis, orthopedic disorders, carpal tunnel syndrome, depression and pancreatitis. (R. at 30.) She testified that she could only lift five pounds, stand for ten minutes, sit for ten minutes and required a cane to ambulate. (R. at 30.) The ALJ determined that Plaintiff was not fully credible. (R. at 30.)

The ALJ then summarized Plaintiff's medical records, which included a history of chronic back pain, pancreatitis from alcohol abuse, smoking and narcotic pain medication usage. (R. at 30.) Plaintiff was prescribed a Lidocaine patch for her lower back and leg pain, but later requested Percocet, regularly taking three pills at once. (R. at 30-31.) At the hearing, she admitted to heroin use within the past year. (R. at 31.)

Plaintiff had tenderness and a limited range of motion in her back. (R. at 31.) She had mild canal stenosis and disc material abutting the exiting right L4 nerve root. (R. at 31.) Plaintiff reported in July 2010 that her lower back pain improved and she later complained of right leg pain, but had a normal range of motion, strength and reflexes. (R. at 31.) In November 2010, she admitted to alcohol use and that she was attending water aerobics one to two times a week. (R. at 31.) Plaintiff underwent an injection and continued to take Percocet for her back pain. (R. at 31.)

In October 2009, Plaintiff overdosed on pain medication. (R. at 31.) She was depressed, because her boyfriend was incarcerated. (R. at 31.) She had been fired from a cashier's job. (R. at 31.) Plaintiff was diagnosed with an adjustment disorder, alcohol dependence and drug abuse. (R. at 31.) Later, she was diagnosed with a drug-induced mood disorder. (R. at 32.) Plaintiff regularly saw a therapist, slept poorly and listened to voices that told her to do bad things. (R. at 32.) In July 2010, she reported that she had been sober for six months. (R. at 32.)

The ALJ also summarized opinions from Drs. Basavaraj, Green and Lakhani and Ms. Wallace. (R. at 31-32.) The ALJ determined that Plaintiff's impairments were not severe enough to preclude her from performing work. (R. at 33.) Plaintiff could tend to her personal care, prepare meals, wash dishes, launder clothes, shop, attend church, watch television, play cards, use public transportation and walk. (R. at 33.) The ALJ assigned little weight to the opinions of Drs. Green, Basavaraj and Lakhani, "because their opinions [were] not supported by the treatment notes in the record." (R. at 33.) Continuing, the ALJ noted that Dr. Green's notes did not reflect severe limitations in Plaintiff or any abnormalities. (R. at 33.) Dr. Basavaraj's treatment notes indicated that Plaintiff had a full range of motion in all extremities. (R. at 33.) Dr. Lakhani documented that Plaintiff was non-compliant with alcohol use and medication,

admitted to working as a cashier and performed household chores. (R. at 33.) Additionally, the opinions were "not consistent with the overall record and with the claimant's own admitted activities of daily living." (R. at 34.)

At step four, the ALJ assessed that Plaintiff was capable of performing her past work as a newspaper/mailing inserter. (R. at 34-35.) The ALJ therefore found that Plaintiff had not been disabled under the Act from September 15, 2009. (R. at 35.)

Plaintiff asserts that the ALJ erred when he assigned little weight to her treating doctors' opinions. (Pl.'s Mem. at 13-21.) She further argues that the ALJ's assessment of credibility was unsupported by substantial evidence. (Pl.'s Mem. at 21-24.) Finally, Plaintiff alleges that the Appeals Council failed to adequately consider new evidence. (Pl.'s Mem. at 24-26.)

## A. Substantial evidence supported the ALJ's assignment of weight to the treating doctors' opinions.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluation that have been ordered. *See* 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the Plaintiff's treating physicians, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. *See* 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other, or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. § 416.927(c)(2), (d).

Under the applicable regulations and case law, a treating physician's opinion must be given controlling weight if: (1) it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques; and, (2) is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. § 416.927(d)(2); SSR 96-2p. However, the regulations do not require that the ALJ accept opinions from a treating physician in every situation, *e.g.*, when the physician opines on the issue of whether the claimant is disabled for purposes of employment (an issue reserved for the Commissioner), or when the physician's opinion is inconsistent with other evidence, or when it is not otherwise well supported. *Jarrells v. Barnhart*, No. 7:04-CV-00411, 2005 WL 1000255, at *4 (W.D. Va. Apr. 26, 2005); *see also* 20 C.F.R. §§ 404.1527(d)(3)-(4), (e).

In his decision, the ALJ assigned little weight to the opinions of Drs. Green, Basavaraj and Lakhani, "because their opinions [were] not supported by the treatment notes in the record." (R. at 33.) Continuing, the ALJ noted that Dr. Green's notes did not reflect severe limitations in Plaintiff or any abnormalities. (R. at 33.) His opinions were "not consistent with the overall record and with the claimant's own admitted activities of daily living." (R. at 34.) Plaintiff argues that Dr. Green's opinions were consistent with an MRI of her lumbar spine dated May 1, 2010, which revealed mild degenerative disc disease at L3-L4, moderate degenerative disc disease at L4-L5 and disc material abutting the right L4 nerve root. (Pl.'s Mem. at 15; R. at 315.)

During his course of treatment, Dr. Green encouraged Plaintiff to take her medications as instructed. (R. at 370.) In March 2010, Plaintiff told Dr. Green that Percocet was "the only medication[] that will work and [she] did not seem open to trying any other medications even when educated about other options." (R. at 369.) She admitted to taking three Percocet pills at

once. (R. at 369.) One month later, he encouraged Plaintiff to exercise three to five times a week for 20 to 60 minutes, take medications as instructed, lose weight, stop smoking and avoid excessive alcohol intake. (R. at 367.) When she visited Dr. Green complaining of sharp, deep pains in her lower back for three days and no relief with medication, he recommended that she take her medication as prescribed. (R. at 478-79.)

In November 2010, Plaintiff "felt good," had no sensory or motor findings, had no edema, clubbing, cyanosis or ulceration and was encouraged to exercise for 20 to 60 minutes three to five times each week. (R. at 474.) That month, Plaintiff also told Dr. Basavaraj that she was attending water aerobics one to two times a week and was encouraged "to pursue as a long-term rehabilitation to improvement in function, reduce tolerance to narcotics and potentially improve re-activations of endorphins, pain and function." (R. at 450-51.)

These patient notes did not support Dr. Green's opinions. For example, in Dr. Green's opinion, he rated Plaintiff's pain and fatigue at a 10 out of 10 that could not be relieved completely with medication. (R. at 525.) However, he continued to request that Plaintiff take her medication as prescribed and continued to prescribe Percocet for Plaintiff. Despite opining that Plaintiff could sit, walk or stand for up to one hour during an eight-hour day, could not continuously sit and could never lift or carry five pounds (R. at 525-26), he encouraged regular exercise for an hour at a time at least three times a week. Dr. Green also marked that Plaintiff had marked limitation grasping objects or using her arms for reaching, a moderate limitation in using her fingers for fine manipulations, and that Plaintiff could not keep her neck in a constant position. (R. at 526-28.) However, observations about Plaintiff's limitations with manipulations or her neck were nowhere in the medical record. As such, the ALJ did not err in determining that Dr. Green's opinions were not supported by substantial evidence.

The ALJ also assigned little weight to the opinions of Dr. Basavaraj, "because [his] opinions [were] not supported by the treatment notes in the record." (R. at 33.) Basavaraj's treatment notes indicated that Plaintiff had a full range of motion in all extremities. (R. at 33.) Additionally, the opinions were "not consistent with the overall record and with the claimant's own admitted activities of daily living." (R. at 34.)

Dr. Basavaraj opined that Plaintiff could only sit for four hours during an eight-hour workday, stand or walk for two hours during an eight-hour workday and would need to move around once every 30 minutes. (R. at 578.) She could occasionally lift 20 pounds, frequently lift 10 pounds and had no limitations with grasping objects, using her fingers or using her arms. (R. at 579-80.) Plaintiff's pain and fatigue periodically interfered with her attention and concentration, rendering her capable of moderate stress. (R. at 581.) Dr. Basavaraj opined that Plaintiff would likely be absent from work for more than three times a month and could not push, pull, kneel, bend or stoop. (R. at 582.)

However, in his treatment notes, Dr. Basavaraj regularly observed a normal range of motion in her hip, knee and ankle without pain, along with 5/5 muscle strength with normal reflexes. (R. at 455-58, 540, 542-44.) He noted that Plaintiff had "not pursued water aerobics," despite his encouragement. (R. at 554.) After noting her MRI results, Dr. Basavaraj prescribed Percocet "for a few months to help with rehab" and again encouraged water aerobics. (R. at 543.) After a nerve study of Plaintiff's right and left arms on August 28, 2010, Dr. Basavaraj noted normal extremities. (R. at 470-71.) Although he performed injections into Plaintiff's trigger points, he noted Plaintiff's normal range of motion, 5/5 muscle strength and normal reflexes. (R. at 453-54.) These normal observations were not consistent with the limitations that

Dr. Basavaraj placed on Plaintiff's abilities. As such, the ALJ did not err in assigning his opinions limited weight.

Finally, Plaintiff asserts that the ALJ improperly weighed the evidence from Dr. Lakhani, because his opinions were consistent with the treatment records. (Pl.'s Mem. at 18-21.) The ALJ assigned little weight to the opinions of Dr. Lakhani, "because [his] opinions [were] not supported by the treatment notes in the record." (R. at 33.) Dr. Lakhani documented that Plaintiff was non-compliant with alcohol use and medication, admitted to working as a cashier and performed household chores. (R. at 33.) Additionally, the opinions were "not consistent with the overall record and with the claimant's own admitted activities of daily living." (R. at 34.)

In November 2010, Ms. Wallace assessed Plaintiff's GAF at 60 with a fair prognosis. (R. at 558.) Ms. Wallace marked that Plaintiff had sleep disturbance, personality change, mood disturbance, emotional lability, a history of substance abuse, recurrent panic attacks, a suicide attempt in 2009, social withdrawal or isolation, hostility and irritability. (R. at 559.)

Ms. Wallace opined that Plaintiff was moderately limited with her ability to maintain attention and concentration for extended periods; perform activities within a schedule; sustain ordinary routine without supervision; work in coordination with others without being distracted; make simple work related decisions; complete a normal workweek without interruption; interact appropriately with the general public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; and respond appropriately to changes in the work setting. (R. at 561-62.) Plaintiff was markedly limited with her ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 562.) Ms. Wallace noted that Plaintiff

was easily overwhelmed and agitated and would withdraw from situations or behave unpredictably. (R. at 563.) Plaintiff's depression increased her chronic pain. (R. at 564.) She was capable of low stress and would be absent from work two to three times a month. (R. at 563-64.) Plaintiff's limitations began in at least 2009. (R. at 565.)

On August 30, 2011, Dr. Lakhani and Ms. Wallace wrote a narrative report documenting Plaintiff's depression, mood swings, crying spells, poor sleep and substance abuse. (R. at 592.) Plaintiff was being treated primarily by Ms. Wallace for major depression with anxiety and substance abuse. (R. at 592.) Plaintiff admitted to episodic alcohol abuse and denied any recent use of heroin or marijuana. (R. at 592.) Ms. Wallace indicated that Plaintiff had difficulty maintaining relationships and reported depression, anxiety, poor sleep, irritability and isolation. (R. at 592.) Plaintiff's "depressive symptoms amplif[ied] her perception of pain." (R. at 592.)

In contrast, when she first met Dr. Lakhani, Plaintiff indicated that she had not worked in two years (R. at 302), although she told doctors two months earlier that she had been fired from her cashier's job (R. at 318). Dr. Lakhani observed a sickly-looking Plaintiff with sad expression, an anxious and depressed mood and affect, poor judgment and insight, and an avoidance of eye contact. (R. at 302.) Plaintiff was diagnosed with drug-induced mood disorder and a combination of drug dependency (including alcohol, heroin, cocaine and marijuana). (R. at 302.)

On April 19, 2010, Plaintiff reported to Ms. Wallace that she was doing okay overall, was taking her medication and tolerating them well, was sleeping poorly and was easily irritable and impatient. (R. at 307.) However, in August 2010, Plaintiff stated that Ms. Wallace was not "treating her right." (R. at 443.) Plaintiff was sleeping poorly, took her friend's Xanax to sleep, watched television, performed household chores, admitted to drinking beer over the weekend and

indicated that she had an "okay" energy level during the day. (R. at 443.) In September 2010, Plaintiff was "a month late for her appointment" and out of medication, sleeping poorly and struggling with chronic pain. (R. at 442.) By March 2011, Plaintiff missed her last two appointments, was out of medicine and had poor sleep, a depressed mood, tearful affect, no psychosis as well as feelings of hopelessness. (R. at 571.) In June 2011, Ms. Wallace documented Plaintiff's depressed mood, appropriate affect, no psychosis, feelings of hopelessness and tiredness, and passive suicide ideations. (R. at 569.)

While patient notes documented that Plaintiff's mood and affect had gotten worse in 2011, Plaintiff was non-compliant with her medication and sporadically visited Ms. Wallace at that time. In 2010, Plaintiff's mood and affect had been improving. Regardless, Plaintiff's non-compliance with treatment did not preclude her from her admitted activities, which included washing dishes, laundering clothes, attending church, shopping for groceries, cooking, watching television, playing cards, reading magazines and the Bible, using public transportation without assistance, visiting with family members and taking walks about four times a week. (R. at 278-82.) *Cf. Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) (discussing the inability for a claimant with schizoaffective or bipolar disorder to comply with medication requirements).

While the ALJ must generally give more weight to a treating physician's opinion, "circuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig*, 76 F.3d at 590 (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992)). Since its decision in *Hunter*, the Fourth Circuit has consistently held that, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro*, 270 F.3d at 178 (citing *Craig*, 76 F.3d at 590); *see also* 20 C.F.R. § 416.927(d)(2). Because the doctors'

opinions were not supported by substantial evidence, the ALJ properly assigned those opinions limited weight.[6]

**B.  Substantial evidence supported the ALJ's assessment of Plaintiff's credibility.**

Plaintiff argues that the ALJ used the incorrect standard in assessing her credibility. (Pl.'s Mem. at 22-23.) Citing Seventh Circuit decisions, Plaintiff contends that the ALJ must compare the claimant's testimony against the evidence in the record. (Pl.'s Mem. at 22-23.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints.

In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7p; 20 C.F.R. §§ 404.1529(a) and 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. *Id.*; SSR 96-7p, at 1-3. The ALJ must consider all the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n.3; *see also* SSR 96-8p, at 13 (specifically

---

[6] If a medical opinion is not assigned controlling weight by the ALJ, then the ALJ assesses the weight of the opinion by considering: (1) the length of the treatment relationship and the frequency of examinations; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area which an opinion is rendered; and (6) other factors brought to the Commissioner's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6); *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). Because substantial evidence did not exist to support the opinions of the treating doctors, the ALJ's assignment of little weight to those opinions was not in error and did confirm with the six factors discussed in *Hines*.

stating that the "RFC assessment must be based on all of the relevant evidence in the case record"). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the individual's ability to work. *Craig*, 76 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility finding of the claimant's statements regarding the extent of the symptoms and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d 595-96; SSR 96-7p, at 5-6, 11.

Plaintiff was prescribed a Lidocaine patch for her lower back and leg pain, but later requested Percocet, regularly taking three pills at once. (R. at 30-31.) She testified that she could only lift five pounds, stand for ten minutes, sit for ten minutes and required a cane to ambulate. (R. at 30.) In November 2010, she admitted to alcohol use and that she was attending water aerobics one to two times a week. (R. at 31.) Plaintiff could tend to her personal care, prepare meals, wash dishes, launder clothes, shop, attend church, watch television, play cards, use public transportation and walk. (R. at 33.) The ALJ determined that Plaintiff was not fully credible. (R. at 30.)

The ALJ's summary of Plaintiff's statements were not mischaracterizations and his ultimate assessment — that Plaintiff was not fully credible — was supported by substantial evidence in the record. For example, Plaintiff indicated at the hearing that she was not "really sure" whether she had worked since September 2009. (R. at 52.) However, Plaintiff's depression worsened in October 2009, because she had recently been fired from her cashier's job. (R. at 318.)

Despite her ability to attend water aerobics one to two times a week and an encouragement "to pursue as a long-term rehabilitation to improvement in function, reduce tolerance to narcotics and potentially improve re-activations of endorphins, pain and function" (R. at 450-51), Plaintiff testified that she could stand for about 10 minutes, sit for about 10 minutes and walk for about five minutes (R. at 56-57). She also stated that she had a cane prescribed to her, but she did not use it every day and did not use it for the hearing. (R. at 57.) In March 2011, Plaintiff admitted that she washed dishes, laundered clothes, attended church, shopped for groceries, cooked and took walks about four times a week. (R. at 278-82.)

This Court must give great deference to the ALJ's credibility determinations. *See Eldeco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *NLRB v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *NLRB v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)). Because substantial evidence supported his decision, the ALJ did not err in reaching his credibility evaluation.

**C.      The Appeals Council did not err when it refused to review the ALJ's decision once it received new evidence.**

Plaintiff requests that the Court remand his case to allow the Commissioner to weigh and resolve the opinion evidence presented by Plaintiff after the ALJ's decision. (Pl.'s Mem. at 24-26.) In determining whether the ALJ's decision was supported by substantial evidence, a court cannot consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99 F.3d 635, 638

n.5 (4th Cir. 1996) (internal citations omitted). However, the Act allows a court to remand a case for reconsideration in two situations. 42 U.S.C. § 405(g). One type of remand is a "sentence six" remand, which provides that a court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*; *see also Borders v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985) (a reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met: (1) the evidence must be relevant to the determination of disability at the time the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence).

The other type of remand is a "sentence four" remand, which provides that a "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the cause for a rehearing." *Id.* If new evidence was submitted to the Appeals Council, the evidence must be new and material for a case to be remanded to the ALJ. *Wilkins v. Sec'y Dept. of Health and Human Servs.*, 953 F.2d 93, 96 n.3 (4th Cir. 1991). New evidence is not duplicative or cumulative. *Id.* at 96. Evidence is material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before him. *Id.*

Plaintiff's new evidence is not material and therefore does not justify remand. On March 6, 2012, Dr. Ettigi assessed Plaintiff's current GAF at a 55. (R. at 291, 298.) Plaintiff was

guarded, unable to work and plagued with chronic disability. (R. at 291.) Dr. Ettigi marked that

Plaintiff had weight loss of 50 pounds, sleep disturbance, irritability, depression, an anxious

mood, social withdrawal, decreased energy, recurrent panic attacks, pervasive loss of interests,

psychomotor agitation, feelings of guilt, difficulty thinking or concentrating and a suicide

attempt in 2009. (R. at 292.)

Dr. Ettigi opined that Plaintiff was moderately limited with her ability to understand and

remember detailed instructions; maintain attention and concentration for extended periods;

perform activities within a schedule; sustain ordinary routine without supervision; make simple

work-related decisions; complete a normal workweek without interruption; interact appropriately

with the general public; accept instructions; get along with co-workers; and maintain socially

appropriate behavior. (R. at 294-95.) He marked that Plaintiff was markedly limited in the

ability to work in coordination with others without being distracted by them and respond

appropriately to changes in the work setting. (R. at 294-95.) Plaintiff had experienced an

episode of deterioration or decompensation and was unable to tolerate social interactions

involving work, stress or a timeline. (R. at 296.) Her depression made her "less tolerant of pain

in general." (R. at 297.) She was incapable of even low stress. (R. at 297.) She would likely be

absent from work less than once a month; her ability to work was "considerably compromised by

her chronic pain, depressed mood and recurrent anxiety." (R. at 298.)

Dr. Ettigi's opinion detailed more limitations than Dr. Lakhani's opinions which, as

discussed above, were not supported by substantial evidence in the record. (*Compare* R. at 291-

98 *with* R. at 558-65, 592.) As discussed above, Plaintiff's depression improved when she was

compliant with her treatment and, despite non-compliance, Plaintiff could nonetheless continue

to wash dishes, launder clothes, attend church, shop for groceries, cook, watch television, play

cards, read magazines and the Bible, use public transportation without assistance, visit with family members and take walks about four times a week. (R. at 278-82.) Because Dr. Ettigi's opinion was not supported by substantial evidence in the record and contradicted other evidence in the record, it was not material and did not warrant a remand to the ALJ for its consideration. Therefore, the Appeals Council did not err when it denied review of Plaintiff's claim.

## VI. CONCLUSION

For the reasons set forth herein, it is the Court's recommendation that Plaintiff's motion for summary judgment and motion to remand (ECF Nos. 7 & 8) be DENIED; that Defendant's motion for summary judgment (ECF No. 11) be GRANTED; and that the final decision of the Commissioner be AFFIRMED.

Let the Clerk forward a copy of this Report and Recommendation to the Honorable Robert E. Payne and to Plaintiff and all counsel of record.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a *de novo* review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/ _____

David J. Novak
United States Magistrate Judge

Richmond, Virginia
Dated:  December 27, 2012

33